UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIEMENS MEDICAL SOLUTIONS USA, INC., | |
| Plaintiff, | Civil Action No. 20 cv 9634 |
| -against- | **COMPLAINT** |
| ANTHONY MEDIGO, | |
| Defendant. | |

Plaintiff Siemens Medical Solutions USA, Inc. ("Siemens Healthineers" or "Plaintiff"), complaining of Anthony Medigo ("Medigo" or "Defendant") as and for its Complaint and Application for Temporary and Permanent Injunctive Relief, alleges as follows:

## The Parties

1.      Plaintiff is a Delaware corporation with a principal place of business in Malvern, Pennsylvania.

2.      Upon information and belief, Medigo is a resident of New York County, State of New York.

## Jurisdiction and Venue

3.      This Court has diversity jurisdiction over the pending matter pursuant to 28 U.S.C. § 1332(a) (1) because Defendant and Plaintiff are residents of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Venue is properly laid in this court pursuant to 28 U.S.C. §1391(b) (1) because Medigo resides in this District.

**Factual Allegations**

**A.      Siemens Healthineers' Business and the Intracardiac Echo Catheters**

5.      Siemens Healthineers is a provider of healthcare solutions and services.  It develops, manufactures and sells a diverse range of market-leading and innovative imaging, diagnostic and advanced therapies products and services to healthcare providers, and also provides clinical consulting services, complemented by an extensive range of training and service offerings.

6.      In or about 2002, Siemens Healthineers acquired a company named Acuson which manufactured, among other things, a device known as the ACUSON Acunav Intracardiac echocardiography catheter (the "2D ICE Catheter"). This device enabled physicians to engage in intraluminal visualization of great vessel anatomy and physiology and intracardiac visualization of cardiac anatomy, physiology and devices within the heart.

7.      In or about 2005, Siemens Healthineers entered into an agreement with Biosense Webster, Inc. ("BWI"), a subsidiary of Johnson & Johnson, under which it sold its 2D Catheters to BWI on an exclusive basis for incorporation into BWI products, which were in turn sold to hospitals, clinics and medical offices.  Through this arrangement, Siemens Healthineers has generated substantial sales which reached approximately $192 million in the fiscal year which ended on September 30, 2019.

8.      Beginning in or around 2006, Siemens Healthineers began developing an intracardiac echocardiography catheter which was designed to provide real-time, three-dimensional imaging for use in valve repair and valve replacement procedures (the "3D/4D ICE Catheter"). This new and improved type of catheter was intended to give interventional cardiologists better and more complete real-time three-dimensional volume imaging.

9.     Siemens Healthineers introduced its first 3D/4D ICE Catheter, known as the AcuNav V, in 2012, followed by the AcuNav Volume ICE Catheter, for which development began in 2014, leading to product introduction in 2018.

10.     The AcuNav Volume ICE Catheter represented a significant improvement over existing ICE Catheters because unlike ultrasound probes which are inserted through the esophagus, it is inserted into the heart through the femoral or jugular vein and allows imaging from inside the heart.   This often eliminates the need for general anesthesia and makes procedures safer and more efficient.

11.     The development of the 3D/4D ICE Catheters, such as the AcuNav V and the AcuNav Volume ICE Catheter, was a time-consuming and expensive product.  The development of the AcuNav Volume ICE Catheter alone consumed more than 300 person months of effort and a cost of approximately $18 million.

12.     The market for the AcuNav Volume ICE Catheter is estimated to grow to approximately $800 million per year by 2030 and at present, and to the best of its knowledge, Siemens Healthineers has a one hundred percent market share of that market.

**B.     Medigo Joins Siemens Healthineers and Accepts the Confidentiality Agreement**

13.     In November 2016, Siemens Healthineers hired Medigo as Vice President Cardiology – Advanced Therapies, a non-senior management position.

14.     In or about the summer of 2018, Medigo participated in an internal workshop concerning the AcuNav Volume Catheter.

15.     In November 2018, Siemens Healthineers promoted Medigo to the position of Vice President – Interventional Therapies, a senior management position.

3

16.    As a requirement for, and as consideration for this promotion, on or about November 13, 2018, Medigo was asked to and did sign a Senior Management Restrictive Covenants, Confidentiality and Intellectual Property Assignment Agreement (the "Confidentiality Agreement")

17.    Section 5(E) of the Confidentiality Agreement provides, in relevant part:

> To protect the Company's trade secrets and other business interests, during the Restricted Period, Employee will not (as an employee, consultant, owner, officer, director, partner, or otherwise) knowingly participate in, manage, supervise or provide Competing Services for a Competing Business in the Restricted Area. The parties expressly stipulate that the foregoing restriction (the "**Non-Compete Restriction**") is necessary because the other restrictions provided for in this Agreement are insufficient to prevent unfair competition and protect the Company's trade secrets and other legitimate business interests standing alone, and because Employee is of special, unique, and extraordinary value.

18.    Section 1(B)(xi) of the Confidentiality Agreement defines Restricted Period as "a period of one (1) year following the date upon which Employee's employment with the Company ends, without regard to which party ended the employment relationship or why it was ended".

19.    The Confidentiality Agreement defines Competing Services, at Section 1(B)(iv), as:

> services that either (i) are the same as, similar to, or comparable in function or purpose to the services Employee provided, worked to develop, managed, or supervised as an employee of the Company in the [last two years of Employee's employment][1] , or (ii) involve the sale, servicing or development of a product or service that competes with a product or service (existing or under development) that Employee had involvement with or was provided Confidential Information about during the [last two years of Employee's employment], (iii) involve material involvement in business dealings with a Covered Customer on behalf of a Competing Business, or (iv) would otherwise be likely to involve the use or disclosure of Confidential Information.

---

[1] This refers to the Look Back Period, which is defined in Section 1(B) (vii) of the Confidentiality Agreement.

20.     The Confidentiality Agreement defines Competing Business, at Section 1(B)(iii), as:

 "any business entity that develops, makes, is known to be developing, or offers a product or service that competes with, or is reasonably expected (within a reasonable period of time) to compete with, a product or service of the Company. A product or service will be considered competitive if it would replace, displace or otherwise interfere with the business opportunities for the Company's product(s) or service(s) of the same, similar or comparable nature.

21.     Section 6 of the Confidentiality Agreement provides, in full:

During employment and the Restricted Period, Employee will provide the Company (through the Head of Human Resources) with twenty one (21) days advance written notice prior to beginning employment with a Competing Business (even if self-employed), and will provide any such prospective employer with notice of this Agreement. If requested, Employee will provide the Company with information about Employee's new or prospective position that is sufficient for Company to verify whether or not the new position would violate this Agreement. Prior to engaging in any legal action to challenge the restrictions provided for in this Agreement, Employee agrees to provide the Company with written notice of his/her intent to challenge the enforceability of the agreement, and if requested by the Company, Employee agrees to meet with the Company and negotiate in good faith over agreed restrictions necessary to protect the Company's legitimate business interests in an effort to resolve disputed issues. Employee acknowledges and agrees that the Company may elect to provide another party notice of this Agreement and an opinion about its applicability. While Employee retains the right to also communicate his or her disagreement with such an opinion if Employee so disagrees, Employee recognizes the Company's legitimate business interest in expressing its opinion and consents to it doing so if it believes such is necessary. Employee agrees that he or she will not assert any claim that such conduct is legally actionable interference or otherwise impermissible regardless of whether or not this Agreement is later found to be enforceable in whole or in part.

22.     In May 2019, Siemens again promoted Medigo, this time to the position of Global Vice President – Intracardiac Catheter Business.

23.     In his position as Global Vice President – Intracardiac Catheter Business, Medigo managed the relationship with BWI in connection with its ongoing purchases of the 2D Catheter. Further, he was responsible for efforts to bring the AcuNav Volume ICE Catheter to market. This

included, among other things, hiring and training the sales force, organizing presentations at trade shows, identifying and developing relationships with what Siemens Healthineers referred to as "key opinion leaders", which included doctors who were seen as likely to want to use the ICE Catheter, hospitals which might be interested in using the device, and manufacturers which might be interested in incorporating the ICE Catheter into their devices.

24.     Medigo supervised a team of five ICE Catheter Sales Executives, one Marketing Professional, one Key Account Sales Professional and one Product Portfolio Management Manager.

25.     From approximately the summer of 2018, when he attended the internal workshop, through his promotion to Global Vice President – Intracardiac Catheter Business, and continuing through the end of his employment at Siemens Healthineers, Medigo developed and acquired detailed knowledge of all aspects of its business concerning the AcuNav Volume ICE Catheter, including building and maintaining relationships with doctors, hospitals and device manufacturers, developing extensive knowledge of the company's marketing and development strategies, sales projections, costs and anticipated profit margins, product strengths and weaknesses, global marketing and expansion plans and plans for the development of the next generation of ICE catheters.

26.     The information about the Siemens Healthineers' ICE cardiac catheters that Medigo helped develop, and to which Medigo was exposed by virtue of his employment and the relationships he developed, represents highly proprietary and confidential information that Siemens Healthineers did not allow to be disclosed outside the company or without permission from the company.

27.     Siemens Healthineers maintains security measures to protect access to its confidential information, including requiring use of unique passwords for access to its computer system and limited access to information within the system which can be based on, among other things, an employee's membership in a particular business area, seniority level and geographic location.

28.     The information, strategic thinking, development and understanding of Siemens Healthineers' marketing plans and the like is highly sensitive and distributed on a need-to-know basis. Medigo had virtually unlimited access to Siemens Healthineers' confidential business information regarding the development, marketing, roll-out and manufacturing of the AcuNav Volume ICE Catheter and marketing plans; in fact, he not only had access to this information and strategic thinking, he was instrumental in aspects of its development.

29.     Moreover, Medigo was expected to study and understand any actual or potential competitors for the AcuNav Volume ICE Catheter and their strategies, and help develop responses and proactive strategies to maintain and enhance the market position of Siemens Healthineers.

C.     **Medigo's Separation and Reaffirmation of the Confidentiality Agreement**

30.     In March 2020, Siemens Healthineers engaged in a temporary recall of the AcuNav Volume Catheter from the market to investigate a limited number of adverse events arising from use of the device.

31.     The temporary recall placed a halt to Siemens Healthineers' sales and marketing efforts of the AcuNav Volume ICE Catheters, resulting in the company's decision to reduce staff, including Medigo.

32.     The temporary recall did not affect the ongoing sales of the 2D ICE Catheter, which continues unabated and unaffected by the voluntary recall, or of emergency use of the AcuNav Volume

ICE Catheter which is still permitted in consultation with the Siemens Healthineers Regulatory and Quality teams.

33.     On July 2, 2020, Medigo executed a "Separation Agreement and General Release" (the "Separation Agreement") in connection with his separation from Siemens Healthineers, which took effect on July 1, 2020.

34.     Pursuant to Section 2 of the Separation Agreement, Siemens agreed to pay Medigo the gross sum of $405,000 in severance, "representing twelve (12) months base pay plus a lump sum bonus equal to [Medigo's] target bonus under the applicable Short Term Incentive Plan with respect to fiscal year 2020" less applicable withholding and FICA taxes.

35.     Siemens Healthineers made the payment to Medigo required by Section 2 of the Separation Agreement on or about July 24, 2020.

36.     In addition, on or about August 21, 2020, Siemens Healthineers paid Medigo the gross sum of $2,084, less applicable taxes, representing unvested shares of stock in Siemens Healthineers AG and Siemens AG that he had received in connection with the share match plan in which he participated.

37.     Section 3(a) of the Separation Agreement provided that, in addition to the payment required by Section 2, Siemens Healthineers would be required to pay Medigo by no later than December 18, 2020, a bonus to Medigo equal to the bonus he would have received under the Short Term Incentive Plan had he remained employed for the entire fiscal year 2020, prorated on the number of days during fiscal year 2020 which elapsed through the end of his employment.

38.     Section 4 of the Separation Agreement provided that if Medigo elected COBRA coverage, Siemens Healthineers was obligated to pay for the cost of health coverage for Medigo and his dependents.

39.     Section 5 of the Separation Agreement obligated Siemens Healthineers to provide Medigo with outplacement services for up to one year in an amount not to exceed $6,000.

40.     As required by Section 5, Siemens Healthineers arranged for Medigo's outplacement services through the Lee Hecht Harrison firm, beginning as of July 6, 2020 for which it has been billed $6,000.

41.     Sections 14 and 15 of the Separation Agreement provide, "Executive acknowledges that he remains bound by any agreements he may have signed during his employment, including but not limited to any non-solicitation, confidentiality or patent and secrecy agreements, including but not limited to the November 13, 2018 senior Manager Restrictive Covenants, Confidentiality and Intellectual Property Assignment Agreement."

42.     When Medigo signed the Separation Agreement on July 2, 2020, he hand-wrote the following directly under his signature, "I have read this separation agreement and general release and I understand all of its terms.  I enter into and sign the agreement knowingly and voluntarily, with full knowledge of what it means", and then signed his name below that statement.

**D.     NuVera's Business**

43.     NuVera Medical Inc. ("NuVera") is a corporation, which on information and belief, is headquartered in Los Gatos, California.

44.     NuVera describes itself on its website as "a portfolio company of Shifamed, LLC [which] is enabling a new era in transcatheter cardiac interventions through the advancement of real-time 3D intracardiac echocardiography (4D ICE)."   The website can be found at https://www.nuveramedical.com/#company.

9

45.     Although, on information and belief, NuVera has not yet made its intracardiac echocardiographic equipment for sale in any country, it has stated that it "expects to receive FDA clearance this year [2020]." https://magazine.cardiology2.com/mar2020/nuvera.

46.     NuVera has announced on its website and in the press that it considers its intracardiac echocardiographic equipment to be technically superior to that of the AcuNav Volume ICE Catheter.

47.     As a result, and on information and belief, NuVera views itself and has been positioning itself as a direct competitor to Siemens Healthineers in the intracardiac echocardiographic equipment market.

48.     On information and belief, NuVera not only views itself and anticipated product offering as a competitor to the AcuNav Volume Catheter, but is in a position to try to take business away from Siemens Healthineers in the 2D ICE Catheter area and by interfering in its exclusive sales agreement with BWI.

E.     **Medigo's Employment at NuVera and Violation of the Confidentiality Agreement**

49.     On information and belief, in or about September 2020, Medigo became employed by NuVera as its Chief Commercial Officer

50.     NuVera's website confirms Medigo's position as Chief Commercial Officer and describes him, in part, as, "bring[ing] over 20 years in the cardiovascular medical device space with a proven track record of commercial success. Prior to NuVera, he held sales leadership and clinical development positions in several large and start up organizations." (https://www.nuveramedical.com/#company)

51.    Notwithstanding the provisions of Section 7 of the Confidentiality Agreement, at no point before joining NuVera did Medigo provide Siemens Healthineers, as required with twenty days advance notice, or indeed with any notice of the intended commencement of his employment with NuVera.

52.    At no point before commencing his employment with NuVera did Medigo provide Siemens Healthineers with information about his new or prospective position sufficient to enable Siemens Healthineers to verify whether his new position would violate the provisions of the Confidentiality Agreement.

**F.    Medigo's Acceptance of the Non-Compete Provisions**

53.    The Confidentiality Agreement and the Separation Agreement contain narrowly limited restrictions on Medigo's post-employment activity and provided significant compensation to Medigo in consideration for his affirmation that the Confidentiality Agreement remained in full force and effect, including the one-year Restricted Period.

54.    Medigo knew or should have known that Siemens Healthineers was relying upon the representations to which he had agreed, and with which he confirmed he would comply, including the confidentiality and non-compete restrictions contained in the Confidentiality Agreement and the Separation Agreement. Siemens Healthineers did rely upon Medigo's representation that he had agreed to the confidentiality and non-compete restrictions set forth in the Confidentiality Agreement and the Separation Agreement in providing Medigo the benefits set forth in those documents.

**G.    Medigo's Breach of the Restrictions**

55.    On information and belief, Medigo's employment at NuVera places him in a position where he will be expected to, and will provide assistance to NuVera in connection with

Siemens Healthineers, and in particular its AcuNav Volume ICE Catheter, with which NuVera's product will compete directly.

56.    On information and belief, Medigo's employment at NuVera places him in a position by which Siemens Healthineers' confidential information will inevitably be disclosed to NuVera.

57.    Siemens Healthineers has not consented to reducing the term of Medigo's contractual restraint, nor did it agree that his employment by NuVera during the Restricted Period, would be permitted under the terms of the Confidentiality Agreement or the Separation Agreement.

## Imminent Irreparable Harm

58.    Medigo's duties and responsibilities on behalf of NuVera by its nature will result in Medigo violating the Confidentiality Agreement and the Separation Agreement, and inevitably using or disclosing Siemens Healthineers' confidential business information and business plans.

59.    If Medigo is allowed to continue his employment with NuVera in violation of the Confidentiality Agreement and the Separation Agreement, it will cause irreparable harm to Siemens Healthineers.  Once lost, Siemens Healthineers' trade secrets cannot be restored. The nature of the losses that would be caused over time if Siemens Healthineers; trade secrets and confidential information were disclosed to NuVera or used to help it in competing with Siemens Healthineers and/or developing a competing business, cannot be fully quantified or fully measured.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

60.     Siemens Healthineers repeats and realleges each and every allegation set forth in paragraphs 1 through 59 hereof as if fully set forth herein.

61.     Siemens Healthineers has in place agreements with Medigo, specifically the Confidentiality Agreement and the Separation Agreement, which impose restrictions on Medigo's acceptance of employment with a competitor of Siemens Healthineers.

62.     By accepting and commencing employment with NuVera (a competitor within the meaning of the Confidentiality Agreement and the Separation Agreement) before the end of the one-year restriction period, after accepting benefits from Siemens Healthineers in an amount in excess of $400,000 as consideration for adhering to the terms of the Confidentiality Agreement and the Separation Agreement, together with other benefits, and in a job which, on information and belief, would require the violation of Medigo's ongoing contractual obligation to protect and not use or disclose the confidential information about Siemens Healthineers' business, Medigo is in breach of Confidentiality Agreement and the Separation Agreement.

63.     By accepting and beginning employment with NuVera before the expiration of the non-compete period, and in a manner which violated his obligations under Section 7 of the Confidentiality Agreement, Medigo has or will provide services to a competitor and/or engage in activities that would compete with the activities of Siemens Healthineers in breach of the Release, the stock option grants and the restricted stock unit awards.

64.     As a result of such conduct, and unless Medigo is enjoined from continuing such conduct and from remaining employed with NuVera, Siemens Healthineers has suffered and will continue to suffer irreparable and incalculable harm, including the loss of proprietary and

confidential information for which it can never be compensated. No adequate remedy at law exists for such a breach.

65.     By virtue of his conduct, Medigo has breached his obligations under the Confidentiality Agreement and the Separation Agreement and should be required to disgorge all sums and benefits that he received thereunder.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Contract)

66.     Siemens Healthineers repeats and realleges each and every allegation set forth in paragraphs 1 through 65 hereof as if fully set forth herein.

67.     Siemens Healthineers has in place agreements with Medigo, specifically the Confidentiality Agreement and the Separation Agreement, which create restrictions on Medigo's acceptance of employment with any competitor of Siemens Healthineers.

68.     On information and belief, Medigo in engaged in violation of his contractual obligations to Siemens Healthineers by commencing employment with NuVera (a competitor within the meaning of the Confidentiality Agreement and the Separation Agreement) and by undertaking job duties, including efforts to interfere with Siemens Healthineers' contractual arrangement with BWI for the sale of 2D ICE Catheters, which would require the violation of Medigo's contractual obligation to protect and not use or disclose the confidential information about Siemens Healthineers' business that Medigo acquired in the course of his employment with Siemens Healthineers

69.     By his aforesaid wrongful actions, Medigo has engaged and will continue to engage in breach of his contractual obligations to Siemens Healthineers.

70.     Medigo's interference with Siemens Healthineers' contractual rights is willful, malicious, and wanton.

71.     As a result of such wrongful interference, and unless Medigo is enjoined from continuing his employment with NuVera in violation of Confidentiality Agreement and the Separation Agreement, Siemens Healthineers has suffered and will continue to suffer irreparable and incalculable harm, including the loss of proprietary and confidential information for which it can never be compensated. No adequate remedy at law exists for such a breach.

**THIRD CAUSE OF ACTION**
**(Tortious Interference with Existing and Prospective Business Relationships)**

72.     Siemens Healthineers repeats and realleges each and every allegation set forth in paragraphs 1 through 71 hereof as if fully set forth herein.

73.     As a result of his employment with Siemens Healthineers, Defendant Medigo was intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between Siemens Healthineers and its clients and its key opinion leaders.

74.     Upon information and belief, Defendant Medigo intentionally, with malice, and without privilege or justification, has interfered and will continue to interfere with Siemens Healthineers' business relationships with certain clients and key opinion leaders using unfair or improper means, and/or with the intent to interfere with such relationships for the benefit of his new employer NuVera.

75.     Defendant Medigo had actual notice of his post-employment obligations under his Separation Agreement and Confidentiality Agreement, which restricted him from soliciting Siemens Healthineers' clients and employees for a period of one year following his termination from employment with Siemens Healthineers.

15

76.     Siemens Healthineers possesses a protectable interest in its contracts and relations with its clients, in that it has a reasonable expectation of their continued association with Siemens Healthineers.

77.     Defendant Medigo's conduct was undertaken with malice, or in knowing disregard of or indifference to, the rights and interests of Siemens Healthineers.

78.     As a direct and proximate result of Defendant Medigo's interference, Siemens Healthineers has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

79.     Siemens Healthineers will continue to suffer this harm unless and until Defendant Medigo is restrained from his current and intended conduct.

80.     As a direct and proximate result of Defendant Medigo's interference, Siemens Healthineers suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation and lost business in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
**(Unfair Competition)**

81.     Siemens Healthineers repeats and realleges each and every allegation set forth in paragraphs 1 through 80 hereof as if fully set forth herein.

82.     Medigo has engaged in unfair competition by, among other things, participating with NuVera in a scheme to effectuate a "knowledge transfer" from Medigo which is derived from and unavoidably incorporates Siemens Healthineers' confidential information, and trade secrets without authorization from Siemens Healthineers.

16

83. As a result, Siemens Healthineers has suffered and will continue to suffer economic and also immediate and irreparable harm to its business.

84. Unless Medigo is enjoined from continuing to be employed by NuVera and thereby achieving the aforementioned knowledge transfer, Siemens Healthineers will suffer irreparable and incalculable harm, including the loss of proprietary and confidential information and business methods for which it can never be compensated. No adequate remedy at law exists for such a breach. Money damages alone are inadequate to compensate Siemens Healthineers in full for the incalculable loss of its competitive advantage, good will, and trade secrets caused by Medigo's wrongful acts.

## FIFTH CAUSE OF ACTION
### (Misappropriation)

85. Siemens Healthineers repeats and realleges each and every allegation set forth in paragraphs 1 through 84 hereof as if fully set forth herein.

86. Upon information and belief, Medigo is pursuing a plan to engage in the intentional and wrongful misappropriation of Siemens Healthineers' property, including its confidential or proprietary information, through a knowledge transfer to NuVera.

87. As a result, Siemens Healthineers has suffered and will continue to suffer economic damages as well as immediate and irreparable harm to its business and goodwill.

88. Unless Medigo is enjoined from his employment with NuVera and thereby achieving the aforementioned knowledge transfer, Siemens Healthineers will suffer irreparable and incalculable harm, including the loss of proprietary and confidential information and business methods for which it can never be compensated. No adequate remedy at law exists for such a breach. Money damages alone are inadequate to compensate Siemens Healthineers fully for the

17

incalculable loss of its competitive advantage, good will, and trade secrets caused by Medigo's wrongful acts.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

89.     Siemens Healthineers repeats and realleges each and every allegation set forth in paragraphs 1 through 88 hereof as if fully set forth herein.

90.     By virtue of his conduct, Medigo has received and retained benefits under the Confidentiality Agreement and the Separation Agreement that he is not entitled to keep because of his wrongful conduct, and said benefits are subject to recovery by Siemens Healthineers.

91.     By virtue thereof, Siemens Healthineers has been harmed in the amount of benefits provided to Medigo under the Confidentiality Agreement and the Separation Agreement in exchange for promises and undertakings that he has violated.

## SEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

92.     Siemens Healthineers repeats and realleges each and every allegation set forth in paragraphs 1 through 91 hereof as if fully set forth herein.

93.     Defendant Medigo was employed by Siemens Healthineers in a position of trust and confidence.

94.     By virtue of his position at Siemens Healthineers, Defendant Medigo owed a fiduciary duty and a duty of loyalty to Siemens Healthineers, both during and after his employment, and was obligated not to divert Siemens Healthineers' business in which it had a tangible expectancy, and not to subvert or misappropriate Siemens Healthineers' confidential information.

95.     Defendant Medigo breached his fiduciary duties owed to Siemens Healthineers by directly or indirectly soliciting and/or diverting Siemens Healthineers' clients and business opportunities, in which it had a tangible expectancy, to NuVera Medical Inc., a direct competitor, and/or subverting or misappropriating Siemens Healthineers' confidential information.

96.     As a direct and proximate result of Defendant Medigo's breach of his fiduciary duties, Siemens Healthineers has suffered and will continue to suffer extensive irreparable injury, loss of good will, harm to its business, and other injury for which there is no adequate remedy at law.

97.     Siemens Healthineers will continue to suffer this harm unless and until Defendant Siemens Healthineers is restrained from taking further action in breach of his fiduciary duties to Siemens Healthineers.

98.     As a direct and proximate result of Defendant Medigo's breach of his fiduciary duties, Siemens Healthineers has suffered and will continue to suffer additional damages, which will continue to accrue in the form of attorneys' fees and costs related to this litigation and lost business in an amount to be proven at trial.

99.     Defendant Medigo committed his actions knowingly, willfully, and in conscious disregard of Siemens Healthineers' rights.  Accordingly, Siemens Healthineers is entitled to recover actual and exemplary damages in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
**(Misappropriation of Trade Secrets Under the Defend Trade Secrets Act –
18 U.S.C. § 1836)**

100.     Siemens Healthineers repeats and realleges each and every allegation set forth in paragraphs 1 through 99 hereof as if fully set forth herein.

101.    Siemens Healthineers has maintained and developed highly valuable trade secrets and other confidential and proprietary information. This information is safeguarded as confidential, secret, and is protected from direct or indirect disclosure.

102.    This information cannot be obtained or properly acquired by outsiders through legitimate means.

103.    Siemens Healthineers' trade secrets and other confidential and proprietary information are extremely valuable and critical to the company's operation and business.

104.    Siemens Healthineers has taken reasonable precautions to preserve the secrecy of the trade secrets that Medigo was provided.

105.    The federal Defend Trade Secrets Act recognizes the protection of company's trade secrets against actual or threatened misappropriation, and provides that actual or threatened misappropriation may be enjoined and that damages may be awarded.

106.    Because Medigo had access to Siemens Healthineers trade-secret information and other proprietary information, his current position at NuVera exposes the protected information to disclosure, create a threatened disclosure, inevitable disclosure, and/or the probable disclosure of such information.

107.    Unless Medigo is enjoined from disclosing and utilizing this confidential information, Siemens Healthineers will continue to be immediately and irreparably harmed because Medigo is now employed by a competitor. Medigo received and currently has the use of trade secrets and other confidential information developed and maintained by Siemens Healthineers This information is not generally known to the public, and Medigo can use such

information, in competition with Siemens Healthineers, to his and NuVera's economic advantage and to Siemens Healthineers' detriment.

108.    Medigo has willfully and maliciously misappropriated and/or threatened to misappropriate Siemens Healthineers' confidential, proprietary information and trade secrets.

109.    As a result of Medigo's threatened misappropriation and/or misappropriation of Siemens Healthineers' trade secrets, Siemens Healthineers has suffered and will continue to suffer damages, as well as immediate and irreparable harm, for which there is no adequate remedy at law.

## **<u>REMEDY SOUGHT</u>**

WHEREFORE**,** Siemens Healthineers respectfully requests that judgment be made and entered against Medigo as follows:

(1)     AS TO ALL CAUSES OF ACTION, an award granting Siemens Healthineers monetary damages, the precise amount to be determined at trial including but not limited to the disgorgement of all benefits and sums provided to Medigo under the Confidentiality Agreement and the Separation Agreement;

(2)     Preliminary and permanent injunctions, whereby Medigo would be enjoined from:

(a)     continuing employment with NuVera Medical, Inc. through July 1, 2021, extended to include any period of time in which he has been employed by NuVera in any position involving or relating to his prior duties and responsibilities with Siemens Healthineers;

(b)     possessing, using, disclosing, or disseminating any confidential data or trade secrets belonging to Siemens Healthineers that were created, discovered, used or tested, or being developed, by Siemens Healthineers during Medigo's employment there, unless generally known in the trade or industry in which Siemens Healthineers is engaged or ascertained from public or published information;

(c)     providing, managing, or supervising services that (i) are the same as, similar to, or comparable in function or purpose to the services Medigo provided to Siemens Healthineers in the two years immediately preceding his last two years of employment with Siemens Healthineers; (ii) involve the sale, servicing or

development of a product or service that competes with a product or service, existing or under development, that Medigo had involvement with or was provided confidential information about during his last two years of employment with Siemens Healthineers, including the 2D ICE Catheter, the AcuNav V ICE Catheter and the AcuNav Volume ICE Catheter (collectively the "ICE Catheters"); (iii) involve, on behalf of a competing business, including NuVera Medical, Inc., material involvement in business dealings with any person or entity doing business with Siemens Healthineers, negotiating to do business with Siemens Healthineers, or to whom a proposal to do business was pending at the time Medigo's employment with Siemens Healthineers ended (i.e., July 1, 2020), and that Medigo had business dealings with, managed business dealings with, or was provided or had access to confidential information about, during the last two years of employment with Siemens Healthineers; or (iv) would otherwise be likely to involve the use or disclosure of Siemens Healthineers' confidential information;

(d)      soliciting or participating in the solicitation of any person or entity doing business with Siemens Healthineers, negotiating to do business with Siemens Healthineers, or to whom a proposal to do business was pending at the time Medigo's employment with Siemens Healthineers ended (i.e., July 1, 2020), and that Medigo had business dealings with, managed business dealings with, or was provided or had access to confidential information about, during the last two years of employment with Siemens Healthineers, for the purpose of (a) diverting business opportunities away from Siemens Healthineers; (b) causing any person or entity doing business with Siemens Healthineers, negotiating to do business with Siemens Healthineers, or to whom a proposal to do business was pending at the time Medigo's employment with Siemens Healthineers ended (i.e., July 1, 2020), and that Medigo had business dealings with, managed business dealings with, or was provided or had access to confidential information about, during the last two years of employment with Siemens, to avoid, stop or reduce business activities with Siemens Healthineers; or (c) inducing any person or entity doing business with Siemens Healthineers, negotiating to do business with Siemens Healthineers, or to whom a proposal to do business was pending at the time Medigo's employment with Siemens Healthineers ended (i.e., July 1, 2020), and that Medigo had business dealings with, managed business dealings with, or was provided or had access to confidential information about, during the last two years of employment with Siemens, to do business with NuVera Medical, Inc. or any parent, subsidiary or affiliate corporation;

(3)      Declaratory judgment that Defendant Medigo breached the Confidentiality Agreement and that, pursuant to Section 7(C) thereunder, Siemens Healthineers is entitled to recover its attorneys' fees, costs and expenses incurred in enforcing the Confidentiality Agreement.

(4)      Attorneys' fees;

(5)      Costs of suit, pre-judgment and post-judgment interest in the maximum amounts

allowed by law;

(6)     Exemplary damages in a sum to be determined by the Court and finders of fact in an amount reasonable and necessary to punish Medio for his willful, malicious and wrongful conduct and to deter future misconduct; and

(7)     Judgment granting Plaintiff such other and further relief as the Court may deem just, equitable, and proper.

Date:   November 17, 2020
         New York, New York

                                    */s/ Eric A. Savage*
                                    Eric A. Savage (ES-4709)
                                    LITTLER MENDELSON, PC
                                    900 Third Avenue
                                    New York, New York  10022.3298
                                    212.583.9600

                                    *Attorneys for Plaintiff Siemens Medical Solutions USA, Inc.*