UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SIEMENS MEDICAL SOLUTIONS USA, INC.,

        Plaintiff,        Civil Action No.

   -against-        **DECLARATION OF JAMES GILMORE**

ANTHONY MEDIGO,

        Defendant.

JAMES GILMORE, of full age, hereby declares pursuant to 28 U.S.C. § 1746:

1. I am Engineering Head of plaintiff Siemens Medical Solutions USA, Inc. ("Siemens Healthineers") I have personal knowledge of the within matters and submit this Declaration in support of the application of Siemens Healthineers for a temporary restraining order and preliminary injunction barring defendant Anthony Medigo from violating the Senior Management Restrictive Covenants, Confidentiality and Intellectual Property Assignment Agreement (the "Confidentiality Agreement") that he signed on November 13, 2018 and from continuing his employment with NuVera Medical Inc. ("NuVera")

    **A.**    **Siemens Healthineers' Business and the Intracardiac Echo Catheters**

2. Siemens Healthineers is engaged in, among other things, the development, manufacture and sale of a wide range of innovative imaging, diagnostic and advanced therapies products and services to healthcare providers.

3. In or about 2002, Siemens Healthineers acquired a company named Acuson which manufactured, among other things, a device known as the Acuson 2D Intra-Cardiac Echo Catheter (the "2D Catheter"). This device enabled physicians to obtain images of heart valves in anticipation of surgery. Under an agreement that I believe was entered into in 2005 agreement, Siemens Healthineers sells its 2D Catheters to Biosense Webster, Inc. ("BWI") on an exclusive basis for incorporation into BWI products, which it then sells to hospitals and other health care providers. Through this arrangement, Siemens Healthineers has generated sales of the 2D Catheters which approximately $192 million in fiscal year 2019.

4. Beginning in or around 2006, Siemens Healthineers began developing an intracardiac echocardiography catheter which was designed to provide real-time, three-dimensional imaging for use in valve repair and valve replacement procedures (the "3D/4D ICE Catheter"). This new and improved type of catheter was intended to give interventional cardiologists better and more complete real-time three-dimensional volume imaging.

5. Siemens Healthineers introduced its first 3D/4D ICE Catheter, known as the AcuNav V, in 2012, followed by the AcuNav Volume ICE Catheter, for which development began in 2014, leading to product introduction in 2018.

6. The AcuNav Volume ICE Catheter represented a significant improvement over existing ICE Catheters because unlike ultrasound probes which are inserted through the esophagus, it is inserted into the heart through the femoral or jugular vein and allows imaging from inside the heart. This often eliminates the need for general anesthesia and makes procedures safer and more efficient.

7. The development of the 3D/4D ICE Catheters, such as the AcuNav V and the AcuNav Volume ICE Catheter was a time-consuming and expensive product. The development of the AcuNav Volume ICE Catheter alone consumed more than 300 person months of effort and a cost of approximately $18 million. The market share for the AcuNav Volume Catheter is estimated to grow to approximately $800 million per year by 2030 and at present, as far as we are aware, Siemens Healthineers has a one hundred percent share of that market.

**B.**    **Medigo's Work on the ICE Catheters**

8. In May 2019, Siemens Healthineers promoted Medigo, who had joined the company in 2016, to the position of Global Vice President – Intracardiac Catheter Business.

9. In his new position, Medigo had two essential functions. First, he managed the relationship with BWI in connection with its ongoing purchases of the 2D Catheter. Second, he was responsible for efforts to bring the AcuNav Volume ICE Catheter to market. This included hiring and training the sales force, organizing presentations at trade shows, working and developing relationships with what we refer to as "key opinion leaders", which included doctors who were seen as likely to want to use the ICE Catheter, hospitals which might be interested in using the device, and device manufacturers which might be interested in incorporating the ICE Catheter into their devices.

10. Medigo supervised a team of five ICE Catheter Sales Executives, one Marketing Professional, one Key Account Sales Professional and one Product Portfolio Management Manager.

11. Continuing through the end of his employment at Siemens Healthineers, Medigo developed and acquired detailed knowledge of all aspects of its business concerning both the 2D Catheter and the AcuNav Volume ICE Catheter, including building and maintaining relationships with doctors, hospitals and device manufacturers, developing extensive knowledge of our marketing and development strategies, sales projections, costs and anticipated profit margins, product strengths and weaknesses, and global marketing and expansion plans.

12. The information about the Siemens Healthineers' cardiac catheters to which Medigo was exposed by virtue of his employment and the relationships he developed represents highly proprietary and confidential information that Siemens Healthineers does not allow to be disclosed outside the company or without permission from the company. Siemens Healthineers maintains security measures to protect access to its confidential information, including requiring use of unique passwords for access to the computer system and limited access to information within the system which can be based on, among other things, an employee's membership in a particular business area, seniority level and geographic location.

13. The information, strategic thinking, understanding of our marketing plans and the like is highly sensitive and distributed on a need-to-know basis. Medigo had virtually unlimited access to Siemens Healthineers' confidential business information regarding the development, marketing, roll-out and manufacturing of the AcuNav Volume Catheter and its marketing plans. In fact, he not only had access to this information and strategic thinking, he was instrumental in aspects of its development.

14. Moreover, Medigo was expected to study and understand any actual or potential competitors for the AcuNav Volume Catheter and their strategies, and help develop responses and proactive strategies to maintain and enhance the market position or Siemens Healthineers.

15. In March 2020, Siemens Healthineers engaged in a temporary recall of the AcuNav Volume ICE Catheter from the market to investigate a limited number of adverse events arising from use of the device. The temporary recall placed a halt to Siemens Healthineers' sales and marketing efforts, resulting in the company's decision to reduce staff, including Medigo. However, sales to BWI of the 2D Catheter, which was unaffected by the voluntary recall, continued unabated and interventional cardiologists were permitted to use the AcuNav Volume ICE Catheter on an emergency basis.

16. On July 2, 2020, Medigo executed a "Separation Agreement and General Release" (the "Separation Agreement") in connection with his separation from Siemens Healthineers, which took effect on July 1, 2020. The Declaration of Maria Nuphaus attaches a copy of the Separation Agreement and proof of payment to Medigo of sums required by that document.

C.     NuVera's Business

17. NuVera is a corporation headquartered in Los Gatos, California which describes itself on its website as "a portfolio company of Shifamed, LLC [which] is enabling a new era in transcatheter cardiac interventions through the advancement of real-time 3D intracardiac echocardiography (4D ICE)." (www.nuveramedical.com)

18. To my knowledge, and as far as I know to the knowledge of Siemens Healthineers, NuVera has not yet made its intracardiac echocardiographic equipment for sale in any country. However, it has stated that it "expects to receive FDA clearance this year [2020]." www.magazine.cardiology2.com/mar2020/nuvera

19. NuVera has announced on its website and in the press that it considers its intracardiac echocardiographic equipment to be technically superior to that of the AcuNav Volume Catheter. As a result, we believe that NuVera views itself and has been positioning itself as a direct competitor to Siemens Healthineers in the intracardiac echocardiographic equipment market. One example is a sponsored article from October 8, 2020 by which NuVera describes its product as ushering in, "A New Era of Transcatheter Cardiac Interventions"

https://www.mystrategist.com/medtech-strategist/article/nuvera_medical_a_new_era_of_transcatheter_cardiac_interventions.html

Although the article does not mention Siemens Healthineers or our products by name, it is clear to anyone in the industry that NuVera is positioning itself as a offering new and technically more advanced product.

20. It is our belief that NuVera not only views itself and anticipated product offering as a competitor to the AcuNav Volume Catheter, but is in a position to try to take business away from Siemens Healthineers in the 2D Catheter area by becoming a vendor to BWI and possibly persuading them to end our long-standing exclusive arrangement.

**D.     Medigo's Employment at NuVera**

21. Medigo claims on his LinkedIn page that he joined Medigo in September 2020 as its Chief Commercial Officer. https://www.linkedin.com/in/anthony-medigo/

22. NuVera's website confirms Medigo's position as Chief Commercial Officer and describes him, in part, as, "bring[ing] over 20 years in the cardiovascular medical device space with a proven track record of commercial success. Prior to NuVera, he held sales leadership and clinical development positions in several large and start up organizations." www.nuveramedical.com

23. To my knowledge and from what I have learned from discussions with others within Siemens Healthineers, at no point before joining NuVera did Medigo provide Siemens Healthineers with any advance notice of the intended commencement of his employment with NuVera. Similarly, he did not provide Healthineers with information about his new or prospective position sufficient to enable Siemens Healthineers to verify whether his new position would violate the provisions of the Confidentiality Agreement.

**E.     Danger to Siemens Healthineers Because of Medigo's Employment with NuVera**

24. It is our belief that Medigo's employment at NuVera places him in a position where he will be expected to, and will provide assistance to NuVera in competition with Siemens Healthineers, and in particular our AcuNav Volume Catheter, with which NuVera's product will compete directly. We also believe that Medigo's employment at NuVera places him in a position by which Siemens Healthineers' confidential information will inevitably be disclosed to NuVera. Indeed, we do not know what Medigo could do as Chief Commercial Officer of NuVera which would not place him in direct competition with us.

25. Siemens Healthineers did not consent to reducing the term of Medigo's contractual restraint, or that he could be employed by NuVera during his one-year non-compete period.

**F.     Immediate Injunctive Relief is Necessary**

26. If Medigo is allowed to continue with employment with NuVera, we believe that it will cause irreparable harm to Siemens Healthineers. Once lost, our trade secrets cannot be restored. For NuVera to have access, through Medigo, to our marketing strategies, relations with key opinion leaders, product strengths and weaknesses, marketing and global expansion plans, profit margins, plans for the next generation of ICE Catheters and the like poses a grave commercial threat. If Medigo discloses any of this information to NuVera, it would create a significant competitive problem which cannot be repaired. Once information is lost to a competitor, it cannot be retrieved and the competitor cannot un-learn it.

27. Moreover, since Medigo is party to (and helped formulate) our long-range planning, disclosure of that information would not just cause us competitive harm now, but is likely to influence how NuVera competes with us in the future. The losses that this will cause cannot be fully measured.

28. We understand that as of July 1, 2021 (or a later date that the Court may order depending on how long Medigo worked for NuVera before issuance of any restraining order), Medigo will be free to begin working for NuVera, although still barred from taking or using any Siemens Healthineers' confidential information. Nonetheless, we have not consented to, and do not consent to, Medigo's employment with a direct rival before the expiration of his restricted period and after he received a substantial severance payment under a document by which he reaffirmed the Confidentiality Agreement.

29. As discussed above, Medigo has deep and wide-ranging knowledge of all aspects of Siemens Healthineers' products, near-term and long-term marketing plans, financial information, customer relations and other aspects that he generated, or to which he had access, during his employment.

30. In our view, the one-year restricted period is reasonable in that it limits him from engaging in immediate competition based on present-day knowledge of all aspects of our business in this area.

31. We believe that Siemens Healthineers will suffer irreparable injury in the absence of a temporary restraining order and preliminary injunction because Medigo will be in a position to facilitate NuVera's competition with our AcuNav Volume product. Siemens Healthineers is entitled to the full benefit of the Confidentiality Agreement that Medigo signed and reaffirmed in the Separation Agreement which resulted in a substantial payment to him. As Medigo works for NuVera, our competitive is lost, can never be taken back, and in our view, cannot be compensated with money damages.

32. Siemens Healthineers has not previously asked this Court, or any other body or court, for injunctive or other relief as to Medigo.

33. We therefore respectfully request that a temporary restraining order and preliminary injunction be issued enjoining Medigo from working for NuVera until July 1, 2021, as extended by any period of time in which Medigo has already been employed by NuVera, and requiring him to abide by all other provisions of the Confidentiality Agreement and the Separation Agreement.

34. I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: November 13, 2020

_____
James Gilmore